IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BENEFICIAL MUTUAL SAVINGS BANK,  :   CIVIL ACTION
                                 :   NO. 12-6256
        Plaintiff,               :
                                 :
    v.                           :
                                 :
STEWART TITLE GUARANTY COMPANY,  :
                                 :
        Defendant.               :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    AUGUST 11, 2014


**Table of Contents**

I. INTRODUCTION............................................... 2
II.   BACKGROUND............................................. 3
III. STANDARD OF REVIEW..................................... 11
IV.  DISCUSSION............................................. 13
        A.    Applicable Law................................ 13
        B.    Analysis...................................... 15
              1.   Parties' Burdens......................... 15
              2.   Terms of Exclusion 3(a).................. 16
              3.   Application of the Exclusion............. 18
              4.   Lender's Objections to Applying the Exclusion.. 20
              a. Lender's Knowledge......................... 21
              b. Lender's Negligence........................ 24
              c. Lack of a Specific Exclusion............... 26
        5.    Exclusion 3(a) Warrants Denying Coverage of the
        Defect............................................. 27
V.    CONCLUSION............................................. 28

I. INTRODUCTION

The plaintiff in this action, Beneficial Mutual Savings Bank ("Lender"), is a lender. The defendant, Stewart Title Guaranty Company ("Insurer"), is a provider of title insurance. Lender loaned $480,000 (the "Loan") to 3010 Ocean Avenue Brigantine, LLC, (the "LLC"), and it was guaranteed by William D. Bucci (defined collectively with the LLC as "Borrowers"). The Loan secured by a mortgage (the "Mortgage") on real estate located at 3010 Ocean Avenue (the "Property").[1]

Insurer issued Lender a title insurance policy (the "Policy") insuring the Mortgage as a first mortgage on the Property. The Policy provides defense and indemnification for, inter alia, lack of priority of the Mortgage over any other liens on the property. At the time the Property was conveyed to the LLC, there was a previous mortgage for the amount of $1,200,000 (the "Prior Mortgage") on the property securing a loan made by Bancorp Bank ("Prior Lender") to the owners of the property prior to the transfer to the LLC. That the Mortgage is subordinate to the Prior Mortgage is the alleged defect (the "Defect") in this case.

The Policy included an exclusion which, inter alia, excluded coverage for any defects which Lender had "agreed" to.

_____

[1]      The LLC granted the Mortgage as owner of the property and Mr. Bucci signed as guarantor.

Thus, the question driving this litigation is whether Lender accepted the Mortgage subordinate to the Prior Mortgage, and thus agreed to the Defect.  If Lender did agree to the Defect, coverage under the Policy is excluded.  If Lender did not agree, it is entitled to defense and indemnification.

For the reasons set forth below, the Court will grant Insurer's Motion for Summary Judgment and deny Lender's Motion for Summary Judgment.


## II.   BACKGROUND

Lender is a chartered bank organized under the laws of Pennsylvania and with its principal place of business in Pennsylvania.  Insurer is an insurance company organized under the laws of Texas and with its principal place of business in Texas.

On November 12, 2009, Lender loaned Borrower $480,000.00 in the form of a commercial mortgage loan.  Pl.'s Mot. Summ. J., Pl.'s Statement Undisputed Facts ¶ 2.  To secure the Loan, the LLC granted Lender a Mortgage which was duly recorded.  Pl.'s Statement Undisputed Facts ¶ 3-4 (citing the Open-End Mortgage and Security Agreement ("Mortgage Agreement")).  Mr. Bucci guaranteed the Loan personally.  At the time the Loan was made, and the Mortgage given, the Prior

Mortgage for $1,200,000, held by Prior Lender, remained unsatisfied.[2]

According to the Loan Information Summary, the purpose of the Loan was "to refinance an existing second mortgage on Borrower[s]' investment property located at 3010 Ocean Avenue." Loan Information Summary 1.  The Loan Information Summary lists the proposed collateral for the Loan as a title insured second mortgage and the assignment of rents, leases, and contracts from the Property.  Loan Information Summary 2.  The Property was appraised, at the time that the summary was prepared, at a value of $2,400,000, and thus, after accounting for the first and second mortgages, the equity remaining in the property was approximately $720,000.  Loan Information Summary 5.

About a month prior to closing, Lender received a copy of a marked-up title commitment prepared by Insurer's title agent, Brendan Abstract ("Abstract Company").  The title commitment lists several outstanding mortgages on the Property. Each outstanding lien contained in the commitment was accompanied by a hand written notation, some barely legible,

---

[2]       At the time of the transfer of the Property to Borrower, the Prior Mortgage was not yet assumed by Borrower or Guarantor, and the Prior Mortgage was thus in default as per the terms of its loan agreement.  Pl.'s Mem. Supp. Mot. Summ. J. 11. The default was cured when the Prior Mortgage was later assumed Borrower and Guarantor.  See Assumption Agreement Allonge.

which Lender claims indicates that each mortgage would be removed prior to closing.[3]  One of these listed mortgages was "Mortgage made by [prior owners] to [Prior Lender] dated February 17, 2005 and recorded February 24, 2005."  Commitment Schedule A.

The Mortgage Agreement executed at the closing of the Loan states that, inter alia, "[e]xcept for a certain first Mortgage disclosed by Mortgagor to Mortgagee, Mortgagor warrants that it presently possesses an unencumbered fee simple title to the Mortgaged Premises, . . . that this Mortgage is a valid and enforceable first lien on the Mortgaged Premises subject only to the aforesaid title objections."  Mortgage Agreement 3.  The Promissory Note, executed at the time of the Loan, states that "[p]ayment of this Note is secured by (a) a second Open-End Mortgage and Security Agreement . . . and (b) the Environmental Indemnity Agreement . . . from Obligor."  Promissory Note.  The Environmental Indemnity Agreement lists, among the collateral securing the Loan, "[a] second Open-end Mortgage and Security Agreement in favor of Bank."  Environmental Indemnity Agreement 1.

---

[3]      Such notations include an uppercase R next to each entry.

Most notably, the Loan Agreement, executed simultaneously with the other documents, states that the Loan was secured by

> [a] valid second lien on good and marketable fee simple title to the Property and improvements located thereon free and clear of all prior liens, restrictions easements and other encumbrances and title objections except such as may have been approved in writing by Bank, to be evidenced by the assignment of a second mortgage . . . covering the property. This mortgage is subordinate to a mortgage to [other bank][4] . . . in the original stated amount of $1,200,000.00.

Loan Agreement 1.

Insurer issued the Policy (title insurance), insuring the Loan and Mortgage.  Pl.'s Statement Undisputed Facts ¶ 5; see also Loan Policy Title Ins.  The Policy provided coverage for fourteen numbered risks which included, inter alia, number

---

[4]      The Loan Agreement lists the first mortgage as held by First Cornerstone Bank and recorded in the "Clerks Office of the County of Cape May."  This is an obvious error as Prior Lender (Bancorp) was the holder of the Prior Mortgage, and the mortgage named in the Policy did not actually exist.  Whether Lender was aware of Prior Lender as the actual holder of the Prior Mortgage, or not, does not change the outcome of this case.  The operative issues are that there was a first mortgage in the amount of $1,200,000 which was senior to the mortgage given to Lender, and that Lender agreed to be junior to that mortgage. Those are the operative facts of the Defect.

The Court notes that the drafting error was committed by Ivan Willie, an "approved attorney" for Lender.  At the time of drafting the loan documents, Mr. Willie's license to practice law was suspended.  Mr. Willie is now disbarred for practicing law without a license, largely due to his various work for Lender.

10 providing for coverage for "[t]he lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance."  Loan Policy Title Ins. 2.[5]

The Policy also includes seven enumerated exclusions from coverage under which the "matters are expressly excluded from the coverage of this policy, and [Insurer] will not pay loss or damage, costs, attorneys' fees, or expenses that arise."  Loan Policy Title Ins. 2.  Exclusion 3(a), in particular, provides an exclusion for "Defects, liens, encumbrances, adverse claims, or other matters: (a) created suffered, assumed, or agreed to by the Insured Claimant."  Loan Policy Title Ins. 2.  Notably, there is not a specific exception included in the Policy which would expressly cover the Defect.

In February 2011, Lender filed a notice of claim ("First Notice") in which it first set forth its theory of why it was entitled to coverage under the Policy.  See Notice Claim, Feb. 7, 2011.  In the First Notice, Lender explained that:

---

[5]     Lender seeks coverage under the covered risks numbered 10-14.  The risks insured by 11-14 include: (11) the lack of priority of the Mortgage upon the title as security; (12) the invalidity or unenforceability of any assignment of the Mortgage; (13) the invalidity, unenforceability, or avoidance of the lien of the Mortgage upon the title; and (14) any defect in lien or encumbrance on the title filed or recorded in the public records subsequent to the date of the Policy and prior to the recording of the Mortgage.

The Commitment indicates that, about a month before the Insured Mortgage was executed, the [Property was] subject to (among others) a $1,200,000.00 mortgage in favor of [First Lender].  The Commitment contained an exception for this prior mortgage, but the exception was marked as "removed" at Closing.  Neither this exception, nor any-other for a prior mortgage, appears in the [] Policy.

[Lender]'s Loan Agreement recites that the Insured Mortgage was to be subordinate to a $1,200,000.00 first mortgage of unspecified date, in favor of First Cornerstone Bank which was allegedly recorded on May 1, 2008, in Mortgage Book 4744, Page 141, in the Office of the Clerk of Cape May County, New Jersey.

Because the [Property is] located in Atlantic County, the Insured Mortgage could never have been subordinate to the lien of a mortgage recorded in Cape May County.

The recording information given for the First Cornerstone Bank mortgage does not correspond to any document recorded in Atlantic County. No mortgage in favor of First Cornerstone Bank was reported on the Commitment.

Further investigation revealed that the document that was recorded in Cape May County at the book and page numbers given is a mortgage in the amount of $2,490,000.00, not $1.200,000.00, which was given to Allegiance Bank of North America, not First Cornerstone Bank.

The [Prior Mortgage] described above remains open and unsatisfied of record. That is the basis for this claim.

Nothing in [Lender]'s loan file indicates that [Lender] knew at the time of closing that the [Prior Mortgage] remained unsatisfied, and the officer who made this loan is no longer with the bank. It seems likely that she simply assumed that the removal of all mortgage exceptions from the Commitment meant that the prior mortgage described in the Loan Agreement had been satisfied or otherwise released, and that the Insured Mortgage would thus be a first lien against

the [Property] notwithstanding what the Loan Agreement
said.

Because the Insured Mortgage is insured as a first
lien, kindly review this letter and its enclosures and
advise what action [Insurer] intends to take to
correct this apparent title defect.

Notice Claim 1-2.  In response, Insurer conducted an

investigation which revealed the numerous errors committed by

all parties to the Policy and the Loan Agreement.  Insurer

closed the preliminary claim in September of 2012, denying

coverage under the Policy.

On May 15, 2012, Prior Lender sought to foreclose on

the Property by filing suit in the state court naming Borrowers

and Lender as defendants.  On June 22, 2012, Lender sent a

second claim letter (the "Second Notice") to Insurer, seeking an

immediate defense in the foreclosure action.  On July 22, 2012,

Lender filed an answer in the foreclosure action, contesting the

foreclosure.  On October 5, 2012, following communications among

the parties and their agents, Insurer denied Lender's claim for

defense and, if necessary, indemnification in the state court

proceeding.  See Denial of Claim Letter, October 5, 2012.  In

denying Lender's claim, Insurer pointed to and relied on

Exclusion 3(a).  See Denial of Claim Letter 5.  The denial

letter explained that

[Lender] produced no less than four documents that are
evidence of the intent of the Insured to hold a second
lien position on the Property: the Loan Summary

9

Information, the Promissory Note, the Open-End
Mortgage and Security Agreement, and the Loan
Agreement.  The Insured also funded its loan after
receiving an Affidavit of Title from [the LLC]
referencing that [the Prior Mortgage] was not being
paid.  From the origination of the loan through the
closing, the documents produced by the Insured
indicate that it had every intention of being in a
second lien position subordinate to a $1,200,000
mortgage that then existed on the Property, and as
such, the Insured received the benefit of its bargain.
The Insured intended that its mortgage would be
subordinate to the $1,200,000 [Prior Mortgage], and as
such accepted the risk associated with holding such a
lien position.  Therefore, any loss or damage suffered
by the Insured arising from holding a lien position
subordinate to the [Prior Mortgage] is a matter
excluded from coverage under Exclusion 3(a) of the
Policy as matter created, suffered, assumed, or agreed
to by the Insured.

Notwithstanding that through inadvertence or mistake
an exception for the [Prior M]ortgage was not included
in the Policy, the Insured obtained its intended lien
position and by doing so, assumed the related risks.
Therefore your request for coverage under the Policy
for matters related to the [Prior M]ortgage is denied.

Denial of Claim Letter 6.[6]

On November 6, 2012, Lender initiated the instant

action.  ECF No. 1.  Following the conclusion of discovery, the

---

[6]     Lender contends that the question whether or not it
"agreed" to the Defect should not be determined by reference to
extrinsic evidence.  This is not the approach taken by New
Jersey courts in determining if an exclusion applies.  See,
e.g., Keown v. W. Jersey Title & Guar. Co., 390 A.2d 715, 718-19
(N.J. Super. Ct. App. Div. 1978).  The application of Exclusion
3(a) requires a determination of Lender's actions with regard to
the Defect.  Therefore, the Court, as it must, will consider
extrinsic evidence.  The Court notes, however, that this
extrinsic evidence is not being used to modify the terms of the
Policy.

parties filed cross motions for summary judgment.  ECF Nos. 24,
25.  Each party filed a response to the other's motion for
summary judgment, and, in turn, each party filed reply briefs.
ECF Nos. 26-29, 32, 33.  The parties' motions are now ripe for
disposition.

On June 17, 2014, the state court entered a final
judgment in the foreclosure action, finding in favor of Prior
Lender and issuing a writ of execution for the foreclosure.

III. STANDARD OF REVIEW

Summary judgment is appropriate if there are no
genuine disputes of material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).
"A motion for summary judgment will not be defeated by 'the mere
existence' of some disputed facts, but will be denied when there
is a genuine issue of material fact."  Am. Eagle Outfitters v.
Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).
A fact is "material" if proof of its existence or non-existence
might affect the outcome of the litigation, and a dispute is
"genuine" if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  Anderson, 477 U.S.
at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 250.

The standard for addressing cross-motions for summary judgment remains the same as if there were only one motion filed.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).[7]  When confronted with cross-motions for summary judgment the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56

_____

[7]    "[C]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

standard." <u>Schlegel v. Life Ins. Co. of N. Am.</u>, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)).

In a diversity case, when faced with a motion for summary judgment, the federal courts follow federal law on issues of procedure but apply the substantive rule of decision from state law.  See <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>Garcia v. Plaza Oldsmobile Ltd.</u>, 421 F.3d 216, 219 (3d Cir. 2005).  The parties rely on New Jersey law in their written submissions to the Court, which indicates their agreement that New Jersey law governs.  <u>See, e.g.</u>, <u>Mellon Bank v. Aetna Bus. Credit, Inc.</u>, 619 F.2d 1001, 1005 n.1 (3d Cir. 1980) (applying state law to case where parties rely on it and do not dispute its application).

## IV.  DISCUSSION

The meaning of the term "agreed," as used in the Policy, is an issue of law.  Whether Lender "agreed" to accept the Defect is an issue of fact.  Insurer, as a proponent of the exclusion, bears the burden of proof.

### A.   <u>Applicable Law</u>

As a general rule, "an insurance policy is interpreted according to its plain and ordinary meaning." <u>Voorhees v.</u>

Preferred Mut. Ins. Co., 607 A.2d 1255, 1260 (N.J. 1992) (citing Longobardi v. Chubb Ins. Co., 582 A.2d 1257 (N.J. 1990)).  "Like other policies of insurance, title policies are liberally construed against the insurer and in favor of the insured." Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 562 A.2d 208, 214 (1989) (citing Sandler v. New Jersey Realty Title Ins. Co., 178 A.2d 1, 5 (N.J. 1962)).  Despite that standard of liberal construction, "courts should not write for the insured a better policy of insurance than the one purchased."  Id.

      "[T]he duty to defend is generally determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the insurer must defend the suit."  SL Indus., Inc. v. Am. Motorists Ins. Co., 607 A.2d 1266, 1271 (N.J. 1992) (internal citation omitted).  Under New Jersey law, the duty to defend is broader than the duty to indemnify, and may arise even where the insurer is not ultimately obligated to pay, particularly where there is a disputed factual issue.  See Hartford Ins. Grp. v. Marson Const. Corp., 452 A.2d 473, 474 (N.J. Super. App. Div. 1982) (citing Burd v. Sussex Mutual Ins. Co., 267 A.2d 7 (N.J. 1970)).

      The initial burden is on the policy holder, Lender in this case, to establish that the claim for defense and, if necessary, indemnity, falls within the insurance agreement, here, the Policy.  Once that burden is met, the burden shifts to

the carrier, Insurer in this case, to establish that an
exclusion or exception applies which would allow it to deny
coverage, here Exclusion 3(a).  "Policy exclusions must be
narrowly construed[, and] the burden is on the insurer to bring
the case within the exclusion."  <u>Charles Beseler Co. v. O'Gorman</u>
<u>& Young, Inc.</u>, 911 A.2d 47, 49 (N.J. 2006) (internal marks and
citation omitted).  An exclusion will be given full effect
provided it is "specific, plain, clear, prominent, and not
contrary to public policy."  <u>Doto v. Russo</u>, 659 A.2d 1371, 1378
(N.J. 1995).

    B.   <u>Analysis</u>

      1.   <u>Parties' Burdens</u>

      In its initial denial, <u>see</u> Denial of Claim Letter 6,
as well as in subsequent filings before the Court, Insurer does
not dispute that the triggering event, the foreclosure on the
Property by the Prior Mortgage as a senior mortgage, would fall
within the coverage set forth in the enumerated risks,
particularly 10 through 14, <u>see</u> Loan Policy Title Ins. 2.
Furthermore, on the face of the Policy (absent the exclusions)
risk 10 clearly provides coverage for the "lack of priority of
the lien of the Insured Mortgage upon the Title over any other
lien or encumbrance," Loan Policy Title Ins. 2, which is the
exact case here.  Accordingly, Lender has satisfied its burden

that the foreclosure of the Prior Mortgage falls within the
Policy and, absent some applicable exception or exclusion,
Insurer would be obligated both to "insure[] . . . against loss
or damage . . . sustained," Policy Title Ins. 1, and "pay the
costs, attorney's fees, and expenses incurred in defense of any
matter" insured by the Policy, Policy Title Ins. 2.

The Court next considers if there is an applicable
exception or exclusion.  Insurer admits, in its denial of
coverage and subsequent filings, that a specific "exception for
the [Prior M]ortgage was not included in the Policy."  Denial of
Claim Letter 6.  Instead, Insurer claims that Exclusion 3(a)
operates to exclude the Prior Lender's foreclosure from coverage
under the Policy.

2.    Terms of Exclusion 3(a)

Exclusion 3(a) excludes "[d]efects, liens,
encumbrances, adverse claims, or other matters: (a) created,
suffered, assumed, or agreed to by the Insured Claimant."  Loan
Policy Title Ins. 2.[8]

---

[8]      Litigation over this type of exclusion is by no means
novel.  In fact, this type of exclusion is one of the most
litigated clauses in the field of title insurance contracts.
See Home Fed. Sav. Bank v. Ticor Title Ins. Co., 695 F.3d 725,
732 (7th Cir. 2012) (quoting Palomar, Title Insurance Law §
6:10).

New Jersey courts have not yet interpreted the terms "assumed" or "agreed to" in the context of this exclusion.[9]  See, e.g., Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd., 858 F. Supp. 2d 402, 421 (D.N.J. 2012), on reconsideration in part, CIV. 97-3496 DRD, 2012 WL 3629045 (D.N.J. Aug. 10, 2012).  A set of often cited definitions for "assume" and or "agree," was provided by the Sixth Circuit in Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780 (6th Cir. 1986).  In that case, the Sixth Circuit explained that

> an insured does not assume [a defect] against property "merely because he agreed to take the property 'subject to' any [defects]."  "Assume," under this definition requires knowledge of the specific title defect assumed.  And "agreed to" carries connotations of "contracted," requiring full knowledge by the insured of the extent and amount of the claim against the insured's title.  As with the other terms, this definition implies some degree of intent.

Id. at 784 (internal citations omitted).  In the absence of any New Jersey or the Third Circuit authority providing a definition, the Court will rely upon the well accepted

_____

[9]      In interpreting the meaning of "created" or "suffered" New Jersey courts have traditionally held that the insurer may only escape liability if the defect, lien, or encumbrance resulted from some intentional misconduct or inequitable dealing by the insured.  See, e.g., BCP Holdings (USA), Inc., A-0741-12T4, 2013 WL 6122492 (N.J. Super. Ct. App. Div. Nov. 22, 2013) (citing Keown v. W. Jersey Title & Guar. Co., 390 A.2d 715, 718-19 (N.J. Super. Ct. App. Div. 1978)), cert. denied, 78 N.J. 405 (1978); Feldman v. Urban Commercial, Inc., 87 N.J. Super. 391, 401 (App. Div.1965); Title Ins. Corp. of Pa. v. Wagner, 179 N.J. Super. 234, 238-40 (Ch. Div. 1981)).

definition of "agreed" provided by the Sixth Circuit and used by other district courts in the Third Circuit.  See Walsh Sec., Inc., 858 F. Supp. 2d at 421-22; Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co., No. 05-281, 2011 WL 611802, at * 22 (E.D. Pa. Feb. 17, 2011), aff'd, 687 F.3d 620 (3d Cir. 2012).  The Court, therefore, construes the term "agreed" as carrying connotations of contracted and requiring full knowledge by the insured of the extent and amount of the claim against the insured's title.  The Court reaches this definition in conformance with ordinary rules of contract interpretation and the oft used definition provided by the Sixth Circuit.[10]  See Charles Beseler Co., 911 A.2d at 49.

        3.    Application of the Exclusion

        First, the Court must identify the exact defect at issue in this case to determine if Exclusion 3(a) applies.  The Defect, as identified above, is that the mortgage securing Lender's loan of $480,000 occupies a secondary lien position to a $1,200,000 first mortgage.  This defect, in the form of a senior lien, led to Lender's First Notice in February of 2011, Lender's Second Notice in June of 2012 upon foreclosure of the senior lien, and Lender's filing of the instant lawsuit seeking

---

[10]        The Court notes that neither party claims that "agreed" as used in the Policy, is ambiguous.

defense and indemnification in the foreclosure suit. Accordingly, the defect at issue in this case is that the Mortgage held by Lender was subordinate to the Prior Mortgage held by Prior Lender.

The Court will focus on whether Lender "agreed" to receive a second mortgage junior to an earlier mortgage on the property.[11]  Notably, as set forth above, the Loan Summary, the Promissory Note, the Mortgage Agreement, and the Loan Agreement, all confirm that Lender "agreed" to accept a second position as security for the Loan.  The Loan Agreement, for instance, specifically designates the Mortgage as a "valid second lien" which is "subordinate to a mortgage . . . [in] the amount of $1,200,000.00."  Loan Agreement 1.

Furthermore, Kenneth Swedler,[12] acting as a 30(b)(6) designated representative of Lender for deposition, admitted that it was Lender's intent to take a mortgage subordinate to a prior $1,200,000 mortgage.

---

[11]     As the exclusion contains the disjunctive "or," the presence of one of the four factors is sufficient and the Court need not address whether Lender "created," "suffered," or "assumed" the Defect.

[12]     Lender designated Kenneth Swedler as its corporate representative for a deposition as per Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Q.   Is it true that [Lender] agreed to take a mortgage subordinate to an existing $1.2 million mortgage?

A.   Yes.

Swedler Dep. 35:20-35:23.  Based on the evidence, even when taken in the light most favorable to Lender, it is clear that Lender "agreed" to the Defect with "full knowledge" "of the extent and amount of the claim [(the Prior Mortgage)] against the insured's title."  Am. Sav. & Loan Ass'n, 793 F.2d at 784.[13]

### 4.   Lender's Objections to Applying the Exclusion

The Court will next address Lender's three main objections to the applicability of Exclusion 3(a).  Lender argues that (1) the policyholder must have full knowledge of the facts and the results those facts will bring about and that, as Lender lacked full knowledge, Exclusion 3(a) cannot apply; (2) New Jersey law requires that there was intentional, fraudulent, or deliberate conduct on the part of Lender for Insurer to prevail on the exclusion and that mere negligence will not suffice; and (3) New Jersey law requires a specific exception to exclude coverage of a prior lien.

---

[13]   Furthermore, the Court notes that Lender likely also assumed the Defect as it "agreed to take the property" with "knowledge of the specific title defect assumed," but the Court's analysis does not reach the issue of whether the Defect was "assumed."

a.      Lender's Knowledge

Lender asserts that "it would have been impossible for
[Lender] to have possessed the requisite level of knowledge and
intent under New Jersey law, because it lacked knowledge of the
full nature and origin of the [Prior Mortgage] at the time that
[Lender] funded [the Loan]." Def.'s Resp. 2.  First, Lender
contends that it was not aware that, at the time it made the
Loan, Borrowers were not the guarantors of the Prior Mortgage.
Def.'s Resp. 11.  Lender argues that it was unaware that the
Loan transaction involved a transfer of the Property to
Borrowers.  Lender claims that, as a result of the simultaneous
transfer, the Prior Mortgage was actually in default at the time
of the Loan.  To reach this conclusion, Lender relies heavily on
the deposition testimony of Stephanie Digan.[14]

> Q. So if you had known that the [prior owners] owned
> the property and they had a 1.2 million dollar
> mortgage with [Prior Lender] that would have gone into
> default the day the [prior owners] sold the [Property]
> to [Borrowers] without paying off the mortgage, would
> you have approved or recommended approval of the
> $480,000 loan from Lender . . . to [Borrowers]?
>
> A. No.

---

[14]      At the time the Loan was made, Ms. Digan was a vice
president and loan officer with Lender.  Ms. Digan was the loan
officer responsible for Loan.

> Q. And the reason is because on the day that you made the [L]oan . . . the [Prior Mortgage] would have been in default, correct?
>
> A. Correct.

Digan Dep. 249:11-250:4.

Even assuming that Lender was not aware of the ownership of the Property and the subsequent default of the Prior Mortgage, it is neither relevant nor material.  Had the default led to the foreclosure, then perhaps this lack of knowledge would be relevant.  Borrowers, however, assumed the Prior Mortgage, with the consent of the Prior Lender, thereby curing the default.  See Assumption Agreement Allonge. Therefore, by the time Lender claims it first discovered that the Prior Mortgage was in default, the default had been cured. Consequently, Lender was left with exactly what it bargained for in the first place, a second mortgage securing the Loan subordinate to a first mortgage of $1,200,000.  The eventual foreclosure of the Prior Mortgage was not a result of the initial default and thus is not material to the current claim.

Lender also relies heavily on Ms. Digan's testimony that she understood that the Prior Mortgage would be removed prior to the Loan.  Pl.'s Resp. 19.  This testimony is insufficient to create a genuine dispute of fact as to Lender's knowledge.  Ms. Digan's testimony is contrary to all of the other evidence in the case including the Rule 30(b)(6)

representative and the documentary evidence, all of which indicate that Lender intended to receive a second mortgage subordinate to a $1,200,000 mortgage.

Whether conflicting testimony is sufficient to raise a genuine issue is a question of federal law.  A party does not create a genuine issue of material fact merely by pointing to testimony by one of its own witnesses which is contradictory with the testimony of its own 30(b)(6) deponent.  Ms. Digan's testimony on this issue is in direct conflict with Lender's own 30(b)(6) deponent and the express terms of the Loan Agreement and the accompanying documentation, and Lender offers no explanation which would explain the difference in testimony. Accordingly, Ms. Digan's testimony does not raise a genuine dispute of fact.[15]

Finally, Lender claims that because the reference to the first mortgage in the Loan Agreement was to a non-existent $1,200,000 mortgage held by First Cornerstone Bank rather than to the actual $1,200,000 loan held by Prior Lender, Lender could not have had the relevant knowledge required under New Jersey law.  Assuming <u>arguendo</u> that Lender actually was mistaken as to

---

[15]    Additionally, given that Ms. Digan's superiors at Lender knew of a senior $1,200,000.00 mortgage on the Property and intended to take the Mortgage subordinate to that senior mortgage, Ms. Digan's understanding is irrelevant.  Accordingly, even if this did create a genuine dispute, it would be an immaterial one.

whether it was First Cornerstone Bank or Prior Lender that held the Prior Mortgage, this lack of knowledge would not change the outcome.  For Exclusion 3(a) to apply, Lender did not need to know every detail of the Defect.  Instead, for Lender to have "agreed" to the Defect, Lender only needed "full knowledge . . . of the extent and amount of the claim."  Am. Sav. & Loan Ass'n, 793 F.2d at 784 (cited by Pl.'s Resp. 14).  Here, the full extent and amount of the claim was the existence of a senior mortgage in the amount of $1,200,000.  Lender has not given any explanation as to why, even if Lender was mistaken, the mere difference as to the identity between First Cornerstone Bank and Prior Lender would be material.

> b.    Lender's Negligence

Lender relies heavily on Keown for the proposition that, under New Jersey law, negligence on the part of the insured in creating a title defect is insufficient to satisfy the "created, suffered, assumed or agreed to" aspect of Exclusion 3(a).  Pl.'s Resp. 18 (citing Keown v. W. Jersey Title & Guar. Co., 390 A.2d 715, 718-19 (N.J. Super. Ct. App. Div. 1978)).  In Keown, the court examined whether a title defect allegedly created when the insured, a trustee, purchased property on behalf of the trust without authority to do so, would be one which was "created" by the insured and thus

24

excluded from coverage under the Policy under the relevant exclusion.  Keown, 390 A.2d at 717-18.  The court explained that "a determination that a negligent causation of the defect does not constitute 'creation' within the meaning of the exclusionary clause would be consistent with the general rules for interpreting insurance contracts."  Id. at 719.

Keown, however, is not analogous to the present case. First, in the case at bar, Lender did not "create" the defect, rather Lender "agreed" to the Defect.  Second, in Keown, the alleged defect, a potentially unmarketable title, arose purely through the negligence of the insured.  In the present case, that the Prior Mortgage occupies a senior position to the Mortgage did not arise through Lender's negligence, but rather Lender intended that the Mortgage would occupy a subordinate position.[16]  Lender's attempt to use its own mishandling of the transaction to rebut Exclusion 3(a) is the opposite of the situation in Keown in which the insurer attempted to exclude coverage on the basis of the insured's negligence.  Accordingly,

---

[16]      The Court does not disagree with Lender that Lender and its agents handled the transaction poorly, but this poor performance, even if negligent, did not create the Defect.

Exclusion 3(a) still operates to exclude coverage of the Defect under the Policy.[17]

### c.   Lack of a Specific Exclusion

Lender cites to Amidano v. Donnelly, 615 A.2d 654 (N.J. Super. Ct. App. Div. 1992), for the proposition that Insurer's "fail[ure] to include a specific exception for the [Prior Mortgage] in the [Insurance] Policy" would require Insurer to insure the Prior Mortgage.  Def.'s Resp. 7-8 (citing Amidano, 615 A.2d at 659).  In Amidano, the insurer included several named exceptions for certain easements but neglected to include an exception for a certain easement allegedly known to the insurer.  Amidano, 615 A.2d at 656-58.  The court held that the "careful description of easements . . . excepted from coverage by reference to the recorded instruments creating them, justifie[d] a reasonable policyholder conclusion that title was insured against easements other than those specific easements,

---

[17]      This same analysis applies to other cases cited by Lender, including Hansen v. W. Title Ins. Co., 220 Cal. App. 2d 531 (Cal. Ct. App. 1963).  In Hansen, the court found that a defect created through the negligence of plaintiff's attorney would not be covered by an exclusion for defects created by the insured.  Whether Lender's attorney in the present case was negligent in his preparation of the loan documents is irrelevant to the applicability of Exclusion 3(a) as this alleged negligence was not the cause of the Defect.

although subject to the exceptions for encumbrances in other named categories." Id. at 658.

Amidano not only fails to aid Lender's argument but also weakens it.  First, the Policy in this case does not contain any specific exceptions for prior liens, making Amidano inapplicable as to Lender's argument on this point.  Second, the Amidano court explicitly held that, in that situation, general exclusions, other than those for easements, would still be applicable as there were only specific exceptions for easements. Thus, Amidano stands directly for the proposition that, in the absence of specific exceptions, a general exclusion would apply.

     5.   Exclusion 3(a) Warrants Denying Coverage of the Defect

The Court finds that the evidence of record, even when taken in the light most favorable to Lender, establishes that Lender intended to receive a second mortgage on the Property in exchange for the Loan, and that Lender intended for the Mortgage to be subordinate to a $1,200,000 first mortgage, whether or not it was that this mortgage was held by Prior Lender or some other lender.  Under these circumstances, no reasonable jury could find that, under the Policy, the Mortgage would be insured against foreclosure of the Prior Mortgage by the Prior Lender. For the Court to hold otherwise would cause the Court to "write

for [Lender] a better policy of insurance than the one purchased."  Walker Rogge, Inc., 562 A.2d at 214.

For all the reasons set forth above, the Court finds that Lender "agreed" to the Defect as it agreed to take a position as a second mortgage, and Lender expected, and bargained for, coverage as a second mortgage, at least insofar as the Prior Mortgage was concerned.  Accordingly, the Court will give Exclusion 3(a) its full effect as it is specific, plain, clear, prominent, and not contrary to public policy.  See Doto, 659 A.2d at 1378.

V.   CONCLUSION

For the reasons set forth above, Exclusion 3(a) applies to the Defect and Insurer does not have a duty to defend or indemnify Prior Lender's foreclosure action pursuant to the Prior Mortgage.  Accordingly, the Court will grant Insurer's Motion for Summary Judgment and deny Lender's Motion for Summary Judgment.